UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

FLORENCE PIPKINS                        )
                                        )
                 Plaintiff,             )
                                        )          No. 1:06-CV-201
v.                                      )
                                        )          Chief Judge Curtis L. Collier
SERVICE CORPORATION                     )
INTERNATIONAL;  SCI MANAGEMENT, L.P.;
SCI TENNESSEE FUNERAL SERVICES          )
INC.  d/b/a CHATTANOOGA FUNERAL         )
HOME; EUGENE M. PIKE, JR; TIM BROWN     )
                                        )
                 Defendants.            )

## MEMORANDUM

Before the Court is the motion for summary judgment (Court File No. 37) filed by defendants

Service Corporation International, SCI Management, SCI Tennessee Funeral Services Inc., Eugene

M. Pike, Jr., and Tim Brown ("Defendants").  Defendants filed a memorandum in support of their

motion (Court File No. 40), plaintiff Florence Pipkins ("Plaintiff") filed a response (Court File No.

44), and Defendants filed a reply (Court File No. 47).  For the following reasons, the Court will

**GRANT IN PART** and **DENY IN PART** the summary judgment motion (Court File No. 37).


I.      **RELEVANT FACTS**

        A.      **Plaintiff**

        Plaintiff, who is female, is a member of the Seventh Day Adventist Church, and part of her

religious observance involves performing no work from sundown Friday to sundown Saturday (Pl.

dep., p. 30).  Her parents are white and Indian but she has African-American ancestry (Pl. dep., p.

60).

**B.     The Defendants**

SCI Tennessee Funeral Services does business as Chattanooga Funeral Home ("CFH"), which has four funeral homes and two cemeteries in the Chattanooga area (Pl. dep., p. 73; Lovin dep., p. 5; Pike dep., p. 17).  Defendant Pike is president of CFH (Pike dep., p. 6).  Defendant Brown is CFH's sales director, and is responsible for hiring and terminating sales counselors (Brown dep., pp. 6-7; Pike dep., p. 18).

Service Corporation International ("SCI") is CFH's parent company (Lovin dep., p. 6; Brown dep., p. 13).  SCI provides employment forms, handbooks, and employment contracts for employees, and sets policy and procedures for CFH (Brown dep., pp. 13, 21-22).  Paperwork for newly hired employees is sent to SCI, as are sales documents (Lovin dep., pp. 6, 25, 34).  Employee sales records have the words "Service Corporation International" at the bottom (Court File No. 46).  SCI also provides online classes for employees (Brown dep., p. 36).  SCI Management is CFH's management company (Pike dep., p. 37).

**C.     Plaintiff's Employment With Defendants**

In January 2004, Brown interviewed Plaintiff for a sales counselor position at Valley View funeral home.  At the first interview, Plaintiff told Brown she was a Seventh-Day Adventist.  After a second interview, conducted with Brown and Pike, Plaintiff was hired (Pl. dep., pp. 63, 66, 72, 74).  She began work on February 9, 2004 (Brown dep., ex. 48).

There was only one other sales counselor at Valley View, Dick Butler, who is a white male.  Butler, who had worked for CFH for over 20 years, had the same $20,000 monthly sales quota as Plaintiff.   When  she  began  work,  Butler  asked  Plaintiff  about  her  sales  goals;  when  she

communicated them to him, she contends Butler stated that if she met her goals, it would cause him to get fired (Pl. aff., ¶ 3). Plaintiff believed Butler and others attempted to divert sales from her. For instance, Plaintiff had put business cards in the kitchen and ladies' restroom at Valley View, but they were removed during her first month of work and again the next month (Pl. aff., ¶¶ 4-5). Butler testified that he put his cards in the ladies' restroom but implied that he did not remove her cards (Butler dep., p. 23).

Because of her conflict with Butler, Plaintiff sought to be transferred to a different CFH location (Pl. dep., p. 147). Brown told Plaintiff she could work at their North Chapel site but it would require she work on Saturday (Pl. dep., p. 148). The North Chapel site needed sales counselors seven days a week, and Plaintiff was willing to work every Sunday but not on Saturdays because she is a Seventh-Day Adventist (Pl. dep., p. 149). The transfer did not occur.

In March 2004, Plaintiff's first full month of employee, she exceeded the quota by $11,000 (Pl. dep., p. 120). That month, Plaintiff and Butler had approximately equal number of floor days (Court File No. 44-18, p. 1), which are when a sales counselor remains in the building to handle sales made by callers or walk-ins. On one of Plaintiff's floor days, the family of a deceased individual came to the building to make funeral arrangements, but Butler made the sale because he said he had taken care of the family previously (Pl. dep., ex. 13). Plaintiff complained to Brown about this incident (*id.*). In April 2004, the floor schedule was changed so Butler had 14 floor days and Plaintiff had 8 (Court File No. 44-18, p. 2). The schedules for May and June 2004 were similarly unequal (Court File No. 44-18). Plaintiff complained to another manager in May that the floor days were unfair (Pl. aff., ¶ 6). In July 2004, Plaintiff was scheduled for some extra floor days at other CFH facilities (Pl. dep., p. 230). Later, assistant sales manager Kathy Landrum reassigned

floor days as Valley View to equalize Plaintiff's and Butler's floor days, but Brown revised the schedule, giving Butler more floor days (Pl. aff., ¶ 8).

In May, with $18,000 in sales, Plaintiff barely missed her quota (*id.*). The following month, in June, Brown sent Plaintiff a written warning for having not met her sales quota twice in a six-month period, and warned that she could be terminated for failure to meet the quota for a third time in a six-month period (Pl. dep., ex. 12). The next month, June, Plaintiff did meet her sales quota (Pl. dep., p. 131). In December 2004, Plaintiff received a second written warning for her failure to make quota twice since September, but she made quota in December (Pl. aff., ¶ 15). She received no other written warnings until August 8, 2005, but she was terminated before having the opportunity to meet her quota for August (Pl. aff., ¶ 16).

Brown testified that no sales counselors met their quotas every single month, and there were no repercussions for failing to meet the quota for one month (Brown dep., p. 197). If a sales counselor did not meet the quota for three months, there would be a verbal reprimand (Brown dep., p. 197). After a fourth month, the counselor would receive a written reprimand, and the counselor would typically be terminated for not making the quota for a fifth month (Brown dep., p. 198).

Plaintiff also complains of a number of other incidents:

Newspaper ad: In December 2004, CFH ran a full-page newspaper advertisement with pictures of their personnel (Pl. dep., ex. 17). Butler was included but Plaintiff was not. Several women were included in the ad. Employees selected for the ad had either a long tenure with the company or were employed in managerial positions (Pike dep., pp. 47; S. Pike dep., pp. 77-78).[1]

---

[1]Defendants point out that in May 2005, CFH paid $150 for Plaintiff's business card to be published along with an article she wrote about pre-arranged funeral services in a local magazine (Pl. dep., pp. 166-70, ex. 22).

Slavery comment: In May 2005, a discussion between Plaintiff and Mary Jo Vaughn, an elderly part-time reception, led Vaughn to note that both women had ancestors with the same last name. Plaintiff testified Vaughn said, "Your family must have been one of our slaves." Until that point, the two had a great relationship. Plaintiff did not report Vaughn's comment to Pike or Brown, but she did tell Landrum, who told Brown, who told Pike. Pike eventually talked to Vaughn about the comment (Pl. dep., p. 218-19; Brown dep., p. 53; Vaughn dep., p. 17).

Pike's comment: In June 2005, a black man passed away (Pl. dep., pp. 223-27). Services were at CFH's East Chapel facility, which is where Plaintiff encountered the man's family and learned no family service counselor was assigned to them. Plaintiff was given the opportunity to take care of them, which she accepted. She insists no one was going to be assigned to the family (*id.*). A couple days later, at an employee sales meeting, Plaintiff testified Pike referred to the incident and said, "We're going to get more of 'those' families," followed by, "I'm not a racist, am I?" (Pl. dep., p. 249). Pike denies making the statement (Pike dep., p. 21).

Stratford House: Plaintiff scheduled a seminar at a nursing home, the Stratford House. Although Plaintiff had scheduled a seminar at the nursing home, Brown accused her of lying about having scheduled a seminar based on conversations with people at the nursing home other than the person Plaintiff had spoken to (Pl. dep., pp. 182-85; Baxter dep., p. 15; Court File No. 44-21).

Ann Allen: On July 23, 2005, Ann Allen, a friend of Plaintiff's, went to Valley View to purchase a funeral book. Allen knew Plaintiff worked there and wanted to make the purchase from Plaintiff. She asked to speak to Plaintiff but Vaughn told Allen Plaintiff was not there, even though it was one of Plaintiff's floor days and she was apparently in the building (Allen dep., pp. 9-10, 13; Pl. dep., pp. 258-261). Plaintiff told Landrum about this incident (Pl. dep. II, p. 16).

Annise Dodson: Another time in July, Annise Dodson called Valley View and spoke to Vaughn. She told Vaughn she would be late to a meeting with Plaintiff at her home, but Vaughn did not relay the information to Plaintiff, who waited in Dodson's driveway for almost an hour (Pl. dep., pp. 257-58).

End of Life Meeting: Plaintiff was involved in an organization, which was holding a meeting on end of life issues. Plaintiff suggested to Defendants that someone from CFH speak, but the company refused because a previous seminar had not resulted in sales, and Plaintiff was told to focus on sales. Rather than allow someone from a different funeral home to speak, Plaintiff convinced Brown that a CFH employee should speak, and as a result, a CFH employee did speak (Pl. dep., pp. 178-82 & ex. 24 & 25).

Employee directory: Plaintiff's name was never typed into the CFH phone list (Pl. dep., p. 213). She complained about the omission to Landrum (Landrum dep., pp. 19-20). Plaintiff's name was handwritten onto the phone list at Valley View, as were the names of two Caucasian male employees (Pl. dep., pp. 213-15, ex. 32A).

Action plan: On August 8, 2005, Brown sent Plaintiff an "action plan," indicating Plaintiff was "at risk." Plaintiff thought she was not in danger of losing her job because she was going to meet her sales quota. But she was upset that Brown was not addressing her complaints that sales were being diverted to Butler (Pl. dep., pp. 186-89, ex. 26).

Gross/Harrison: In August, Plaintiff was upset that a family asked specifically for her but the sale was made a different sales counselor, John Janik. Plaintiff recalled the name of the family as Gross, but CFH believes it was the Harrison family. It appears the Grosses were friends of the Harrisons, and that Janik made sales to both families in July and August. Peggy Harrison testified

that she was referred to Plaintiff, and met with her to make a purchase in the summer of 2005. Harrison said she was pleased with Plaintiff's service, and never told anyone at CFH otherwise. Shortly after the purchase, Janik called the Harrisons about a problem, and the Harrisons "completed a second set of documents" with CFH because they felt the first policy was too expensive. Janik testified he was under the impression the Harrisons were upset about having to go over documents multiple times, and it was possible they were upset with Plaintiff. Brown testified he talked to Janik about the matter and was under the impression the Harrisons were upset about the service provided by Plaintiff. Janik recalls the Gross family approaching him at a funeral and making an appointment with him, which led to a sale (Pl. dep., pp. 190-94; Court File No. 44-17; Brown dep., ex. 43; Court File No. 44-23, p. 10; Court File No. 44-22; Janik dep., pp. 7-8, 10-11).

### D. Overtime Hours

CFH held mandatory weekly sales meetings on Fridays, although people did not always attend (Pl. dep., pp. 148-49). Plaintiff states that Brown told her not to write down all of her overtime hours (Pl. dep., p. 101). She claims she was not allowed to report overtime hours if she did not have sufficient sales (Pl. dep., pp. 101, 239; Pl. aff., ¶10). Plaintiff claims, without citing evidence, that she was present at a sales meeting on June 24, 2005, but her timesheet for that day shows no hours (Pl. dep., ex. 29). The timesheet shows Plaintiff worked 41 hours that week between Monday and Thursday (*id.*).

Plaintiff was permitted to miss a sales meeting on August 12, 2005 because her mother was ill (Pl. dep., p. 192). The following week, on August 18, 2005, Plaintiff told Brown she would not attend the mandatory sales meeting set for the following day (Brown dep., pp. 89-90). Plaintiff had already worked 40 hours that week and was upset about losing sales (*id.*; Pl. dep., pp. 193-95).

Brown told her she would get overtime for attending the sales meeting (Brown dep., p. 90).

Brown placed a handwritten note in Plaintiff's employment file, which stated he spoke with Plaintiff about attending Friday meetings but not reporting hours (Brown dep., ex. 50). "I told her, she needed to put down all hours worked. She said she was not putting down hours on Friday." (*Id.*).

In July 2005, investigators from the Department of Labor interviewed several family service counselors about whether employees were not being paid for times they worked (Pl. dep., pp. 244-45). Plaintiff was not interviewed, but in response to a question from Pike, said she would have truthfully told the investigators she works as many hours as necessary to meet her quotas, regardless of whether management allowed her to record or be paid for those hours (*id.*; Pl. dep., ¶ 12).

### E.     Plaintiff's Termination

Plaintiff was terminated for what CFH's general manager described as insubordination. Plaintiff did not attend a mandatory sales meeting on Friday, August 19, 2005, and was fired on Monday, August 22. Brown told Plaintiff to attend the meeting, and he documented his conversation with Plaintiff. Plaintiff testified Brown knew she would miss the meeting and that he told her nothing important would be discussed at it. Plaintiff told Brown she was not going to attend to attend the meeting, at which Janik would be present, because of the "emotion that I was feeling" as result of Janik making the sale to the Harrisons. Brown recalls telling her she had to be at the meeting, but alleges she refused and basically hung up on him. In his documentation, Brown did not note whether he told Plaintiff she would be fired for missing the meeting, although he "knew in his mind at that time" he would fire her if she missed the meeting. In addition to not reporting to work, Brown attributed Plaintiff's termination to "her production and attitude." In documents filed

with the Tennessee Department of Labor concerning Plaintiff's unemployment benefits, CFH stated

Plaintiff was *not* discharged for unsatisfactory performance. Plaintiff agrees her sales were not

good, as she had just two sales in the previous six weeks. (Brown dep., pp. 89, 90, 104-05, 158, ex.

48; Lovin dep., p. 8; Pl. dep., p. 191-92, 197-98, ex. 27; Pl. aff., ¶ 18).

In a conversation on the day of her termination, Plaintiff stated she did not realize she had

to attend the meeting, but Brown said there was no way she could have misunderstood his direction

to attend. Brown said Plaintiff had developed a bad attitude, which he attributed to her trouble

making sales, and terminated her for "lack of sales, bad attitude . . . [and] insubordination for not

reporting to meetings" (Pl. dep., ex. 28). Plaintiff contends not attending the meeting was a simple

miscommunication (Court File No. 44, p. 24).

Plaintiff agrees there were issues with her attitude, but attributes them to management not

correcting problems (Pl. dep., p. 198). Landrum had noted Plaintiff's unhappy demeanor, and that

Plaintiff was not speaking to other employees (Landrum dep., pp. 40-42). Brown described

Plaintiff's attitude as "getting really terrible" in August 2005, and described her as "very cold"

towards him and her coworkers (Brown dep., pp. 157, 161).

### F. Plaintiff's Complaint

Plaintiff filed this case (Court File No. 1), alleging the corporate defendants committed (1)

racial discrimination in violation of Title VII; (2) religious discrimination in violation of Title VII;

(3) gender discrimination in violation of Title VII; (4) violation of the Fair Labor Standards Act; (5)

retaliatory discharge; and (6) violation of the Tennessee Human Rights Act ("THRA"). She also

alleges Pike and Brown violated the THRA.

## II. STANDARD OF REVIEW

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

First, the moving party must demonstrate no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). The Court views the evidence, including all reasonable inferences, in the light most favorable to the non-movant. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). However, the non-movant is not entitled to a trial based solely on its allegations, but must submit significant probative evidence to support its claims. *Celotex*, 477 U.S. at 324; *McLean v. Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). The moving party is entitled to summary judgment if the non-movant fails to make a sufficient showing on an essential element for which it bears the burden of proof. *Celotex*, 477 U.S. at 323. In short, if the Court concludes a fair-minded jury could not return a verdict in favor of the non-movant based on the record, the Court may enter summary judgment. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 251-52 (1986); *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

## III. DISCUSSION

### A. Race, Gender, and Religious Discrimination

Plaintiff alleges race, gender, and religious discrimination in violation of Title VII and the THRA. Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges

of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The THRA contains a similar prohibition, and is analyzed in the same manner. Tenn. Code Ann. §4-21-401; *Newman v. Fed. Express Corp.*, 266 F.3d 401, 406 (6th Cir. 2001).

To establish discrimination, a plaintiff can present either direct evidence of discrimination or circumstantial evidence supporting an inference of discrimination. *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004). "The direct evidence and circumstantial paths are mutually exclusive; the plaintiff can meet her burden with either method of proof." *Weberg v. Franks*, 229 F.3d 514, 523 (6th Cir. 2000). In this case, Plaintiff seeks to prove her case through circumstantial evidence, which the Court will analyze under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and later modified by *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981). Under the framework, the Plaintiff must first establish a prima facie case. *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 706 (6th Cir. 2006).

### 1. Prima Facie Case

A prima facie case requires Plaintiff to show (1) she was a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position; and (4) she was treated differently than similarly-situated, non-protected employees. *Wright*, 455 F.3d at 707.

Defendants contend Plaintiff cannot establish a prima facie case of disparate treatment. Defendants dispute the second element, contending Plaintiff's evidence consists largely of employment actions that are not materially adverse; the third element, contending Plaintiff was not qualified; and the fourth element, contending she cannot show she was treated differently than similarly-situated, non-protected employees. Plaintiff contends she has sufficient evidence to support a prima facie case.

The second element requires Plaintiff to show she suffered an adverse employment action. An adverse action must be a "materially adverse change in the terms and conditions of [] employment." *Hollins v. Atlantic Co.*, 188 F.3d 652, 662 (6th Cir. 1999). The Sixth Circuit has defined a materially adverse employment action to mean:

> a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits. Such a change must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.

*Tepper v. Potter*, 505 F.3d 508, 515 (6th Cir. 2007) (internal quotation marks and citation omitted).

Plaintiff satisfies the second element because she was fired. *See Vincent v. Brewer Co.*, 514 F.3d 489, 495 (6th Cir. 2007) ("An employer's decision to discharge an employee is a classic example of an adverse employment action."). In addition to her termination, Plaintiff considers various other incidents to be adverse employment actions, including sales being diverted to white male employees, her inability to transfer to another work site without having to work on Saturday,[2] and the other incidents mentioned in the facts section. However, these incidents are not significant changes in employment status. *Tepper*, 505 F.3d at 515; *see Bowman v. Shawnee State Univ.*, 220

---

[2]To the extent Plaintiff is alleging she was denied reasonable accommodation necessary for her religious belief, her claim fails. A claim for failure to provide reasonable accommodation requires Plaintiff to show (1) she holds a sincere religious belief that conflicts with an employment requirement; (2) she has informed the employer about the conflicts; and (3) she was discharged or disciplined for failing to comply with the conflicting employment requirement. *Tepper*, 505 F.3d at 514. Defendants contend Plaintiff cannot satisfy the third element. Indeed, Plaintiff lacks a reasonable accommodation claim because the decision not to transfer to another CFH work site was not a discharge or discipline. She continued to work at the Valley View site. In addition, Plaintiff's brief does not argue a religious accommodation claim.

F.3d 456, 461 (6th Cir. 2000) ("The Sixth Circuit has consistently held that de minimis employment actions are not materially adverse and, thus, not actionable.").  These incidents, however, may be evidence of disparate treatment.

Defendants also dispute the third element, contending Plaintiff was not qualified for her position.  Being qualified requires Plaintiff to demonstrate she was meeting her employer's "legitimate expectations" at the time of her discharge.  *Vincent*, 514 F.3d at 495; *Warfield v. Lebanon Correctional Inst.*, 181 F.3d 723, 729 (6th Cir. 1999).  Defendants argue Plaintiff was not meeting legitimate expectations because she was not making enough sales, had a bad attitude, and missed a mandatory sales meeting.  These reasons improperly conflate Defendants' explanation for terminating Plaintiff with her qualifications for the job.  *See Cline v. Catholic Diocese*, 206 F.3d 651, 660-61 (6th Cir. 1999) ("[W]hen assessing whether a plaintiff has met her employer's legitimate expectations at the prima facie stage of a termination case, a court must examine plaintiff's evidence independent of the nondiscriminatory reason 'produced' by the defense as its reason for terminating plaintiff").  The Court must "focus on a plaintiff's objective qualifications to determine whether he or she is qualified for the relevant job. . . . [T]he inquiry should focus on criteria such as the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills."  *Wexler v. White's Fine Furniture*, 317 F.3d 564, 575 (6th Cir. 2003) (en banc).

Defendants have not challenged Plaintiff's objective qualifications for the job.  They claim her sales were too low, but based on Brown's testimony about his expectations of employees in general, the fact that Plaintiff did not make enough sales in August is not objective evidence she was unqualified.  Defendants also describe Plaintiff as unqualified because of her attitude, but her

attitude is unrelated to her objective qualifications.  *See id.* (citing *Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1298 (D.C. Cir. 1998) (noting that "courts traditionally treat explanations that rely heavily on subjective considerations with caution," and that "an employer's asserted strong reliance on subjective feelings . . . may mask discrimination")).  Defendants have not challenged Plaintiff's objective qualifications for her position, and a reasonable jury could conclude Plaintiff was qualified for her job.

Defendants also argue Plaintiff has no evidence a similarly situated, non-protected employee was treated more favorably.[3]  This comparison requires Plaintiff to compare her treatment with fellow employees whose employment situation is "nearly identical" in all relevant aspects.  *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998).  The goal is to "raise an inference the adverse action was motivated by discriminatory animus."  *Birch v. Cuyahoga County Probate Court*, 392 F.3d 151, 166 (6th Cir. 2004).

Brown has never fired another employee for insubordination (Brown dep., p. 267).  However, Brown recalled terminating a white female employee, Callie Cronnon, for missing several days of work without excuses (Brown dep., pp. 84-85).  At the time, in late March 2005, Brown prepared a memo listing six incidents over a one-and-one-half month period in which Cronnon missed work (Brown dep., ex. 59).  A personnel form shows Cronnin resigned on April 22, 2005 (Brown dep., ex. 60).  Prior to that, in December 2004, Brown verbally warned another white female employee, Beverly Beaird, about falsehoods related to sick days (Brown dep., ex. 63 & 64).  That employee also resigned about one month later (Brown dep., p. 255).

---

[3]This fourth element can also be satisfied by a plaintiff showing she "was replaced by a person outside the protected class."  *Vincent*, 514 F.3d at 495.  The parties have pointed to no evidence about who, if anyone, replaced Plaintiff.

Taking the evidence in the light most favorable to Plaintiff, two white female employees engaged in conduct similar to Plaintiff's and yet were not fired. Although both resigned about one month later, their treatment appears to have been different from Plaintiff's. Thus, Plaintiff has produced a prima facie case of discrimination. *See Cline*, 206 F.3d at 660 ("The prima facie requirement for making a Title VII claim is not onerous, and poses a burden easily met. The prima facie phase merely serves to raise a rebuttable presumption of discrimination by eliminating the most common nondiscriminatory reasons for the employer's treatment of the plaintiff.") (internal quotation marks, citations, and brackets omitted).[4]

### 2. Legitimate, Nondiscriminatory Reasons

Because Plaintiff has established a prima facie case, Defendants bear the burden of production to put forth a "legitimate, nondiscriminatory reason" for Plaintiff's termination. *Wright*, 455 F.3d at 706. Defendants have articulated three legitimate, nondiscriminatory reasons: Plaintiff's inability to meet her sales quota, her insubordination by not attending the mandatory sales meeting, and her poor attitude. "These constitute legitimate, nondiscriminatory reasons . . . because they are reasons, supported by admissible evidence, which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *Id.* at 707.

### 3. Pretext

---

[4]Defendants ask the Court to apply the same-actor inference, "which allows one to infer a lack of discrimination from the fact that the same individual both hired and fired the employee." *Buhrmaster v. Overnite Transp. Co.*, 61 F.3d 461, 463, 464 (6th Cir. 1995) (noting the inference applies in all discrimination cases). However, the Sixth Circuit has "reject[ed] the idea that a mandatory inference must be applied in favor of a summary-judgment movant whenever the claimant has been hired and fired by the same individual." *Wexler*, 317 F.3d at 573 (en banc). The same-actor inference "is insufficient to warrant summary judgment for the defendant if the employee has otherwise raised a genuine issue of material fact." *Id.* at 573-74. Therefore, the inference is inapplicable here.

Because Defendants have met their burden of production, Plaintiff must show Defendants' reasons are a "pretext for discrimination." *Id.* A plaintiff can establish pretext by demonstrating that the defendant's articulated legitimate, nondiscriminatory reason either: (1) lacks a basis in fact, (2) did not actually motivate her discharge, or (3) was insufficient to motivate her discharge. *Vincent*, 514 F.3d at 497.

Taking the evidence in the light most favorable to Plaintiff, a jury could conclude Defendants' proffered reasons are pretexts. Plaintiff's inability to meet her sales quota could be a pretext because Brown testified he would normally not fire an employee until he failed to meet his quota for a fifth month; Plaintiff had been given an action plan but was fired within just two weeks; and the unemployment forms filed with the Tennessee Department of Labor stated Plaintiff was not fired for unsatisfactory performance. Plaintiff's alleged insubordination could be a pretext because Plaintiff apparently believed she did not have to attend the meeting, and although Brown may have known he would terminate Plaintiff for not attending, he did not communicate that to her. Plaintiff's bad attitude could also be a pretext because it was insufficient to motivate her discharge. There is no evidence Plaintiff was warned she was at risk of termination from a bad attitude.

Accordingly, the Court will **DENY** Defendants' summary judgment motion on Plaintiff's discrimination claims.

### B. Hostile Environment

Plaintiff alleges she suffered from a hostile work environment based on her race. Defendants contend Plaintiff lacks sufficient evidence of a hostile work environment.

Title VII prohibits racial harassment that creates a hostile or abusive work environment. *Newman v. Federal Exp. Corp*., 266 F.3d 401, 405 (6th Cir. 2001). To establish a prima facie case

of a hostile work environment based on race, a plaintiff must show: (1) she is a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was based on race; (4) the harassment had the effect of unreasonably interfering with her work environment by creating an intimidating, hostile, or offensive work environment; and (5) the existence of employer liability. *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 600 (6th Cir. 2007). "A hostile work environment occurs '[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). The workplace environment "must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998) (citing *Harris*, 510 U.S. at 21-22).

In determining whether there was a hostile or abusive work environment, the Court must look to the totality of the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 787-88. Isolated incidents alone must be extremely serious to serve as a basis for liability. *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 790 (6th Cir. 2000).

Plaintiff cites two incidents, the comments by Vaughn and Pike. Defendants contend the conduct Plaintiff alleges is not sufficiently severe or pervasive to be a hostile work environment. The fact that two comments were made during Plaintiff's 18 months of employment does not suggest her workplace was permeated with hostility, even with the two comments being made in consecutive

months towards the end of Plaintiff's employment. The first comment, from Vaughn, is at most an insensitive or offensive utterance, given that Plaintiff and Vaughn had a good relationship and were discussing their family histories.

The statement Pike allegedly made is more troublesome. As the president of the company, he is clearly Plaintiff's superior. His reference to "those families," followed by him asking her if he was racist, could cause Plaintiff offense or uncomfortableness. But the two comments remain isolated incidents, and were not physically threatening, humiliating, abusive, or highly offensive. The isolated incidents were not serious enough to create a hostile work environment. Accordingly, the Court will **GRANT** Defendants' summary judgment motion on Plaintiff's hostile environment claim.

### C.      Fair Labor Standards Act

Defendants contend Plaintiff's Fair Labor Standards Act ("FLSA") claim is meritless because Plaintiff has no evidence she worked overtime for which she was not paid and Defendants were not aware of any overtime hours of which Plaintiff did not inform them. Plaintiff contends she was required to attend Friday meetings but was not paid for them unless she met certain sales requirements.

FLSA "requires employers to pay their employees time-and-a-half for work performed in excess of forty hours per week." *Acs v. Detroit Edison Co.*, 444 F.3d 763, 764 (6th Cir. 2006) (citing 29 U.S.C. § 207(a)(1)).[5] The employee must prove she "performed work for which [she] was not properly compensated." *Myers v. Copper Cellar Corp.*, 192 F.3d 546, 551 (6th Cir. 1999) (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686-87 (1946)). FLSA defines

---

[5]There are exceptions to the requirement, none of which has been raised in this case.

"employ" as "to suffer or permit to work." § 203(g).

The only specific meeting Plaintiff claims to have attended but not been paid for is the June 24, 2005 weekly sales meeting (Court File No. 44, p. 46). But Plaintiff cites no evidence she was at the June 24 meeting. She also contends she was required to be present at the Friday meetings and her timecard shows she recorded hours most Fridays (*id.*). Excluding August 12 and 19, days on which Plaintiff did not attend the sales meetings, her calendar for 2005 shows 30 Fridays (Pl. dep., ex. 29). Plaintiff reported hours on 23 of those 30 Fridays, and took a health or vacation day on two Fridays. There are no hours reported for five Fridays. Other than a general statement that Plaintiff was required to attend sales meetings, she has produced no evidence she was in attendance at the meetings on any of the five Fridays for which no hours were reported. Plaintiff also testified that people did not always attend the sales meetings (Pl. dep., pp. 148-49), so it is not evident she attended the five meetings on Fridays for which she reported no hours. Even if she did attend those sales meetings, there is no evidence of how many hours Plaintiff worked.

Furthermore, Plaintiff was responsible for writing down her hours on her timecard, and she has no evidence Defendants failed to pay her for hours she reported working (Pl. dep., pp. 156, 201, 206-07, 240). To succeed on an FLSA claim, an employer must know or have reason to believe an employee is working. *Wood v. Mid-America Mgmt. Corp.*, 192 F. App'x 378 (6th Cir. 2006) (citing *Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 718 (2d Cir. 2001)). Thus, her FLSA claim also fails because "an employee must show that the employer knew or should have known that [she] was working overtime." *Id*. Defendants are not liable for failing to pay overtime that Plaintiff did not report.

Accordingly, the Court will **GRANT** Defendants' summary judgment on Plaintiff's FLSA

claim.

### D. Retaliation

Defendants contend Plaintiff cannot make out a prima facie case of retaliation for engaging in protected activity under Title VII, THRA, or FLSA. Plaintiff's response to summary judgment alleges she was retaliated against for engaging in protected activity only under FLSA, so the Court assumes Plaintiff is no longer alleging she engaged in protected activity under Title VII or THRA.

Without direct evidence, a prima facie case of retaliation requires Plaintiff to show (1) she engaged in protected activity under FLSA; (2) Defendant knew she engaged in the protected activity; (3) Defendants subsequently took an adverse, retaliatory action against Plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action. *Adair v. Charter County of Wayne*, 452 F.3d 482, 489 (6th Cir. 2006). Once a prima facie case is established, the burden of producing some non-discriminatory reason falls upon the defendant. *Id.* If the defendant demonstrates such, the plaintiff then assumes the burden of showing that the reasons given by the defendant were a pretext for retaliation. *Id.*

Defendants dispute the first element, contending Plaintiff was never involved in protected activity during her period of employment with Defendants, and the fourth element, contending there is no causal connection between any purported protected activity and her termination.

As to the first prong, whether Plaintiff was engaged in protected activity, Defendants contend Plaintiff did not file an FLSA claim during her period of employment (Pl. dep., p. 245). However, Plaintiff claims she told Pike in July 2005 that *if* she was interviewed by the Department of Labor, she would have truthfully told them she works as many hours as necessary to meet her quotas, regardless of whether management allowed her to record or be paid for those hours (Pl. dep., ¶ 12).

She cites evidence about discussions with Brown, but those notes indicate Brown told Plaintiff to attend Friday meetings and report the hours (Brown dep., ex. 50; Pl. dep., ex. 27). Plaintiff contends Brown's account conflicts with hers (Court File No. 44, p. 45), but Plaintiff testified she did not remember the conversation, not that she has a conflicting account (Pl. dep., pp. 192-93). Plaintiff also alleges she complained to management about being required to attend Friday meetings but not being paid for those meetings if she had already worked 40 hours in a week, but cites no evidence of this.

FLSA protects employees against retaliation for filing "any complaint." 29 U.S.C. § 215(a)(3). Lodging a complaint with an employer is among the activities protected by FLSA. *McDaniel v. Transcender, LLC*, 119 F. App'x 774, 779 (6th Cir. 2005); *Moore v. Freeman*, 355 F.3d 558, 562 (6th Cir. 2004). Although there is some evidence Plaintiff talked to her employers about being paid overtime, there is no evidence Plaintiff filed a complaint about not being paid overtime. In other words, she did not engage in protected activity.

As to the fourth prong, Defendants contend there is no causal connection between protected activity and Plaintiff's termination. "To establish the causal connection required in the fourth prong, a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).

Plaintiff did not make any arguments that a causal connection exists. At best, a connection could be inferred based on the timing, in that Brown and Plaintiff discussed the overtime issue on August 18, 2005 and Plaintiff was terminated four days later. Evidence "that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation." *Id.* However,

Plaintiff must "proffer evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action." *Zanders v. National R. Passenger Corp.*, 898 F.2d 1127, 1135 (6th Cir. 1990). Here, the evidence establishes that Plaintiff was told she would be paid overtime, yet Plaintiff did not show up for work on Friday, August 19. There is no indication she was terminated for seeking overtime; rather, she did not show up for work that day, and her reasons for not showing up related to her sales performance and an apparent miscommunication over whether she had to attend. There is no basis for concluding she was terminated for asking for overtime or for filing a complaint related to overtime. Accordingly, the Court will **GRANT** Defendants' summary judgment motion on Plaintiff's retaliation claim.

### E.      Corporate Defendants

Defendants seek to dismiss Service Corporation International[6] and SCI Management, L.P., because they were not Plaintiff's employers and are not otherwise subject to any liability. Plaintiff contends there is enough evidence those two entities were Plaintiff's employers in addition to CFH.

There are multiple doctrines by which a defendant who does not directly employ a plaintiff can still be considered an employer. *Swallows v. Barnes & Noble Book Stores*, 128 F.3d 990, 993 (6th Cir. 1997). In the doctrine Plaintiff relies on, "courts examine whether two entities are so interrelated that they may be considered a 'single employer' or an 'integrated enterprise.'" *Id.* (citing *York v. Tennessee Crushed Stone Ass'n*, 684 F.2d 360 (6th Cir. 1982)). The single employer test requires courts to examine four factors: "(1) interrelation of operations, i.e., common offices, common record keeping, shared bank accounts and equipment; (2) common management, common directors and boards; (3) centralized  control of labor relations and personnel; and (4) common

---

[6]Defendants refers to this entity as "SCI Corporation International."

ownership and financial control." *Id.* at 994; *see Armbruster v. Quinn*, 711 F.2d 1332, 1338 (6th Cir. 1983). "None of these factors is conclusive, and all four need not be met in every case." *Swallows*, 128 F.3d at 994; *Armbruster*, 711 F.2d at 1337.

Here, there is insufficient evidence to consider SCI or SCI Management to be a single employer with CFH. There is some interrelation of operations in that SCI employment forms, contracts, and handbooks are used by CFH employees, and CFH uses other SCI forms. Furthermore, sales documents are apparently sent to SCI offices in Houston. However, there is no evidence of common management. *See Swallows*, 128 F.3d at 994-95 (citing cases). Nor is there evidence SCI controlled labor relations, i.e., "had the power to hire and fire employees." *Id.* at 995. Although administrative functions are routed through Houston and personnel forms are created there, there is no indication anyone outside CFH could hire or fire personnel. Finally, there is common management, but this is insufficient in light of the other elements, especially the lack of control over labor relations. *See id.* at 994 ("control over labor relations is a central concern"). As for SCI Management, L.P., the only evidence Plaintiff cites is that it is CFH's management company. There is no evidence SCI Management, L.P., employed Plaintiff. Therefore, the Court will **GRANT** Defendants' summary judgment motion as to defendants Service Corporation International and SCI Management, L.P. and **DISMISS** them from this case.

**F.    Individual Defendants**

Plaintiff seeks to impose individual liability on defendants Pike and Brown under the THRA.[7] The "THRA is broader than Title VII in terms of who may be held liable for harassment

---

[7]Under Title VII, only an employer can be held liable. *Wathen v. Gen. Elec. Co.*, 115 F.3d 400, 405 (6th Cir. 1997).

and discrimination." *Carr v. UPS*, 955 S.W.2d 832, 835 (Tenn. 1997), *overruled on other grounds by Parker v. Warren County Util. Dist.*, 2 S.W.3d 170 (Tenn. 1999). The THRA makes it unlawful to "Aid, abet, incite, compel or command a person to engage in any [discriminatory practices]." Tenn. Code Ann. § 4-21-301(2). This requires proving a defendant "encourage[d] the employer to engage in employment-related discrimination or prevent[ed] the employer from taking corrective action." *Allen v. McPhee*, 240 S.W.3d 803, 807 (Tenn. 2007).

In her response to Defendants' summary judgment motion, Plaintiff contends (1) Brown and Pike encouraged a hostile work environment by not reprimanding Vaughn for her harassing remarks until after Plaintiff filed a complaint with the EEOC; (2) Brown and Pike did not follow up on the discriminatory practices taking place, (3) Brown and Pike failed to investigate actions taken by Vaughn, Janik, and Butler; and (4) Pike assisted Brown by allowing Brown to control the hiring and firing of family service counselors. None of these allegations are sufficient to impose liability on Brown or Pike.

The individual defendants are not liable because they were acting as agents of their employer and therefore could not have aided and abetting their employer. This is because Tennessee recognizes intracorporate conduct as that of a single entity. *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 703 (Tenn. 2002). "A basic principle of agency is that a corporation can act only through the authorized acts of its corporate directors, officers, and other employees and agents. Thus, the acts of the corporation's agents are attributed to the corporation itself." *Id.* In *Trau-Med*, the Tennessee Supreme Court held that a corporation cannot commit conspiracy with its own agents because they are not separate entities. Likewise, agents of a corporation, such as Pike and Brown, cannot aid and abet their employer because they are the employer. *See also Crutchfield v.*

*Aerospace Ctr. Support*, No. 98-6105, 1999 WL 1252899, *2, 1999 U.S. App. LEXIS 32765 (6th Cir. Dec. 14, 1999); *Eppes v. Enter. Rent-A-Car Co.*, No. 3:05-CV-458, 2007 WL 1170741,*33-34, 2007 U.S. Dist. LEXIS 29084 (E.D. Tenn. Apr. 18, 2007); *Jenkins v. Nashville Pub. Radio*, No. 3:02cv0179, 2005 WL 3358871, *7, 2005 U.S. Dist. LEXIS 33280, *19-21 (M.D. Tenn. Dec. 9, 2005); *McNeail-Tunstall v. Marsh USA*, 307 F. Supp. 2d 955, 974 (W.D. Tenn. 2004).

In addition, the first three of Plaintiff's allegations claim Brown and Pike did not take certain actions, but failure to act is insufficient for individual liability. *Rhea v. Dollar Tree Stores*, 395 F. Supp. 2d 696, 705 (W.D. Tenn. 2005). Instead, liability under the THRA requires affirmative conduct by the individual defendant to aid or abet the employer. *Id.*

Because neither Brown nor Pike are liable, the Court will **GRANT** Defendants' summary judgment motion as to Brown and Pike and **DISMISS** them from this case.


**IV.     CONCLUSION**

For the foregoing reasons, the Court will **GRANT IN PART** and **DENY IN PART** the summary judgment motion (Court File No. 37), and will **DISMISS** defendants Service Corporation International, SCI Management, L.P., Eugene M. Pike, and Tim Brown.

An Order shall enter.


**/s/**‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
**CURTIS L. COLLIER**
**CHIEF UNITED STATES DISTRICT JUDGE**